E-FILED
Tuesday, 18 October, 2016  10:48:01 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT CODKT.URT
CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

SANDRA BROWN, LATRASHA JOHNSON, )
JERRI LINDSEY, and LAVI CONNER, on behalf )
of themselves and a class of others similarly )
situated, )  Case No. 15-1447-MMM
 )
  Plaintiffs, )
 )
   v. )
 )
ANGELA LOCKE, et al, )  Hon. Judge Mihm, Presiding
 )
  Defendants. )

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR
<u>MOTION FOR CLASS CERTIFICATION</u>**

## TABLE OF CONTENTS

Introduction................................................................................................................................1

Legal Standard ..........................................................................................................................2

Statement of Facts......................................................................................................................3

Proposed Classes........................................................................................................................9

Discussion ................................................................................................................................10

I.        CLASSES I AND II SATISFY RULE 23(a)'S THRESHOLD REQUIREMENTS ........11

          A.        Numerosity........................................................................................................11

          B.        Commonality......................................................................................................12

          C.        Typicality ..........................................................................................................15

          D.        Adequacy of Representation ..............................................................................16

II.       CLASS I SATISFIES THE REQUIREMENTS OF RULE 23(b)(3)...............................17

          A.        Predominance....................................................................................................17

          B.        Superiority of Class Litigation..........................................................................18

III.      CLASS II SATISFIES THE REQUIREMENTS OF RULE 23(b)(2).............................20

Conclusion ...............................................................................................................................21

## INTRODUCTION

In this Motion, the four named Plaintiffs seek to represent approximately 200 other prisoners who, like them, underwent a degrading, traumatic, and painful mass public strip search at Logan Correctional Center on October 31, 2013.  As the Court will see from the evidence in this Motion, including affidavits and grievances from over 100 other prisoners, the strip search was inhumane, punitive, and contrary to the protections of the Eighth Amendment.  During the so-called "cadet training exercise," Orange Crush tactical team members in riot gear yelled at and threatened the compliant women; women were strip searched in full view of non-participants to the search, including male and female cadets, correctional officers, and administrators, and other prisoners; menstruating women were forced to remove sanitary products in front of others and left to bleed on themselves during the exercise; Defendants denied women bathroom access for hours; and Defendants subjected women to lengthy, painful, and unnecessary handcuffing solely to train cadets.  These cruel conditions were common to each member of the class.

Accordingly, Plaintiffs ask this Court to certify a damages class under Rule 23(b)(3) of the Federal Rules of Civil Procedure, as well as an injunctive class pursuant to Rule 23(b)(2).  Courts routinely certify class actions challenging cruel strip search methods and no reason exists to depart from this precedent here.  The classes easily satisfy Rule 23's threshold requirements of numerosity, commonality, typicality, and adequacy of representation.  The common questions arising from the October 31, 2013 public group strip search at Logan Correctional Center predominate.  In addition, class adjudication is a superior method for addressing the violation of the class's civil rights to vindicate the rights of class members unable to prosecute their claims on an individual basis due to the prohibitive cost and challenges of litigation, and to avoid the

inefficiencies of numerous nearly-identical lawsuits. Finally, the single, cohesive injunction Plaintiffs seek to end Defendants' practice of humiliating women during mass public strip searches would provide relief to each member of the proposed injunctive class, rendering class certification appropriate under Rule 23(b)(2).

In short, this case is one that calls out for justice and for reform, and Rule 23 provides the most efficient and comprehensive avenue to achieve it. The Court should therefore certify Class I and Class II.

## LEGAL STANDARD

A court may certify a case as a class action if the party seeking certification meets all the requirements of Federal Rule of Civil Procedure 23(a) and one of the requirements of Rule 23(b). *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 373 (7th Cir. 2015). Rule 23(a) requires the party seeking certification to demonstrate the threshold requirements of numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a)(1)-(4). A (b)(3) class is properly certified so long as "questions of law or fact common to class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). A (b)(2) class, in turn, is properly certified if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

"Plaintiffs bear the burden of showing that a proposed class satisfies the Rule 23 requirements, but they need not make that showing to a degree of absolute certainty." *Bell*, 800 F.3d at 377 (citation omitted). "[A] court weighing class certification must walk a balance

2

between evaluating evidence to determine whether a common question exists and predominates, without weighing that evidence to determine whether the plaintiff class will ultimately prevail on the merits." *Id.* at 377.[1]  Plaintiffs' proposed classes satisfy Rule 23 and should be certified.

## STATEMENT OF FACTS

Logan Correctional Center is a correctional center operated by the Illinois Department of Corrections ("IDOC").  In October 2013, Logan housed approximately 2000 women with security classifications ranging from minimum to maximum security. Exh. A, 30(b)(6) Testimony of IDOC, Deponent Angela Locke, at 15:22-15:25; 16:19-16:21. On October 31, 2013, the Illinois Department of Corrections sent a group of 100 to 120 cadets from the IDOC training academy to Logan for a "cadet training exercise." *Id.* at 23:19-23:22, 25:25-26:02. Accompanying the cadets were various supervisors, including Acting Warden Angela Locke (*id.* at 24:15-24:23); instructors from the IDOC training academy (*id.*); and approximately 10-15 members of the "Orange Crush" tactical team (*id.* at 27:16-27:21).

On the morning of October 31, 2013, the officers, cadets, and supervisors arrived at housing units 11 and 15 of Logan Correctional Center to conduct the training exercise. *See* Exh. A, at 19:13-19:17.  By the afternoon, according to IDOC's own count, approximately 170 to 200 women had undergone strip searches. *Id.* at 22:04-22:13; *see also generally* Exh. B (Declarations); Exh. C (Grievances); Exh. D (Deposition Testimony of Lavi Conner); Exh. E (Deposition Testimony of Sandra Brown); Exh. F (Deposition Testimony of Latrasha Johnson). The abusive, humiliating, and degrading nature of those strip searches is documented in sources

---

[1] This is particularly true in this case, since the parties agreed to postpone any discovery concerning the merits of Plaintiffs' claims until this Court has ruled on class certification.  *See* Dkt. 51 (Joint Proposed Discovery Plan); *see also* Text Order of July 8, 2016 (entering scheduling order).

that include the deposition testimony of three class representative (Exhs. D, E, & F); declarations from a fourth class representative and twelve additional women (Exh. B); and grievances from 99 women (Exh. C).

Specifically: The Orange Crush officers arrived wearing orange jumpsuits, gas masks, helmets, and boots, and carrying batons. *See* Exh. A, at 60:04-60:11; Exh. D at 31:11-31:15, 91:01-91:07. They screamed and yelled at the prisoners and threatened to put them in segregation for failing to comply with orders. *E.g.*, Exh. B at pg. 1 ¶2, pg. 3 ¶2, pg. 5 ¶2; Exh. D, at 32:14-32:18; Exh. F, at 33:11-33:14; 42:03-42:08.  Cadets and officers ordered the women to submit to a strip search in view of other cellmates, male correctional officers, male and female IDOC training academy cadets, the then-Warden of Logan Correctional Center, other men and women who were standing and walking by in the hallways; and scores of prisoners, cadets, and correctional officers in adjacent wings who had a clear view of the women through large windows on their cells.  Exh. B at, *e.g.*, pg. 1 ¶3, pg. 3 ¶¶ 3, 5; Exh. D at 41:02-43:19, 45:13-46:06, 47:20-23; Exh. E at 36:21-37:12, 47:22-48:12, 50:01-50:10, 58:16-58:21; Exh. F at 47:05-47:21; Exh. C, at 1-2 ("My door opened to find both men and women present. I was then told . . . to strip down of my attire in my door way.  Where everyone on the unit could see me going through the strip search routine.  I felt very violated, molested and sexually exploited to all of the male unknown c/o who were present.  After I asked why do I have to take my clothes off in front of men c/os?  I was told to do what we say . . ."); *see generally* Exh. C at 3-185 (raising similar complaints regarding presence of men and others during the strip searches).  Many women asked to move out of the doorway of their cell or to be searched in private or outside the view of males, but their requests were refused. *E.g.*, Exh. C at 1-2, 9-10, 17-18, 20, 42-43, 44-45.  En masse,

4

and on full display for anyone to see, the women were required to lift their breasts, bend over and spread their buttocks, and squat and cough, exposing their genitals. *E.g.*, Exh. B at pg. 1 ¶4, p. 3 ¶5; Exh. D at 72:14-73:02; Exh. E at 45:22-46:21; Exh. F at 45:07-45:20.

Menstruating women were forced to remove sanitary napkins and tampons in view of their cellmates and other non-participants to the strip search, and some bled on themselves during the search. *E.g.*, Exh. B, at pg. 5 ¶4, pg. 11 ¶4, pg. 15 ¶4; Exh. C at 16, 42-43, 100, 156-57, 166, 180-81; Exh. D at 62:21-62:23, 72:05-72:18; Exh. E at 46:01-46:03; Exh. F at 45:09-46:15. After the strip searches were completed, the women were not allowed to wash their hands or clean themselves even though they had touched intimate parts of their bodies while being searched. *E.g.*, Exh. B, at pg. 5 ¶6, pg. 12 ¶6, pg. 16 ¶7; Exh. C at 166; Exh. F at 50:12-50:23. Many women who were menstruating were not given replacement feminine sanitary supplies and therefore bled on themselves during the remainder of the training exercise. Exh. B, at pg. 5 ¶4, pg. 15 ¶4; Exh. C at 156-57, 180-81; Exh. D at 37:08-37:16, 62:21-62:23; Exh. E at 47:01-47:03, 70:15-70:19.

After the prisoners were permitted to get dressed, the cadets practiced handcuffing their hands behind their backs, tightly, a particularly painful position. *E.g.*, Exh. C at 48-49, 82-83, 122-23, 147-48, 165-66; Exh. D, 49:19-51:11; Exh. E at 67:23-68:10, Exh. F at 55:03-56:17, 62:03-62:07. They did so even though prisoners are typically not handcuffed when transported in line from one place to another within a correctional facility. *See* Ex. G, 30(b)(6) Testimony of IDOC, Deponent Alan Pasley, at 16:05-16:18; Exh. D at 49:19-51:11, Exh. E at 68:17-68:20. In the hours that followed, many prisoners notified the correctional staff that the cadets had handcuffed them too tightly, causing bruising and other injuries, but correctional staff refused to

5

loosen the handcuffs. *See, e.g.*, Exh. C at 58-59; Exh. F at 55:21-56:17, 62:01-62:07; *see also* Exh. B at pg. 2 ¶7, pg. 4 ¶7.

The handcuffed women were escorted them to the gym or day room, where they were forced to sit facing the wall for hours, with their hands tightly handcuffed behind their backs. *E.g.*, Exh. B at pg. 2 ¶7; pg. 4 ¶7; Exh. D at 52:17-52:21; Exh. E at 70:15-70:19; Exh. F at 73:19-73:21.  They were not allowed to use the bathroom, even though it was in close proximity.  *E.g.*, Exh. B at pg. 2 ¶¶7, 9; pg. 4 ¶¶7-8, pg. 26, ¶¶7-8; Exh. D at 55:20-57:08; Exh. F at 72:21-73:20. At least one prisoner urinated on herself, and another vomited.  *E.g.*, Exh. B at pg. 2 ¶¶7, 9; pg. 4 ¶¶7-8, pg. 26, ¶¶7-8; Exh. C at 17-18, 48-49; Exh. D at 55:20-57:08.  Many prisoners who were menstruating bled through their clothing and onto the floor. *E.g.*, Exh. B, at pg. 5 ¶4, pg. 15 ¶4; Exh. C at 156-57, 180-81; Exh. D at 37:08-37:16, 62:21-62:23; Exh. E at 47:01-47:03, 70:15-70:19.

Unbeknownst to the women at the time (*see, e.g.*, Exh. B at pg. 2, ¶8; Exh. D at 48:17-48:21), the entire mass public strip search operation was a so-called "training exercise" for cadets. Exh. H, Dep. of Felipe Zavala, at 11:12-12:17. The IDOC Training Academy conducts these types of training exercises twice with each cadet class, at the end of the six-week training period.  Exh. G, Testimony of IDOC, Deponent Alan Pasley, at 16:24-17:03; Exh. H, at 10:13-10:17.  Housing units 11 and 15 were chosen at random for the strip searches – not because of any particularized concerns about contraband concealed on any prisoner's body.  Exh. A, at 52:21-53:05; *see also id.* at 22:19-22:22.

The cadet training exercise was implemented through a centralized chain of command, with Acting Warden Locke giving the briefing prior to the training exercise, the debriefing

6

afterwards, and orders throughout the exercise.  *See id.* at 40:19-40:24, 42:14-42:19, 43:03-43:11, 47:19-48:03, 70:07-70:16.  Pursuant to Locke's orders, the exercise was uniform and monolithic:

Q.  Did the cadet training exercise target any specific prisoners?

A.  No.

Q. Were any individual prisoners singled out for special scrutiny during the cadet training exercise?

A.  No.

Q.  Were any individual prisoners afforded any special treatment during that cadet training exercise?

A.  No.

Q. Were all of the prisoners treated the same way throughout the cadet training exercise?

A. Yes.

Q. Did the cadets follow the same procedure when they were strip searching each individual woman during the cadet training exercise?

A. Yes.

Q.  Did the cadets follow the same procedure when they were handcuffing each individual woman during the cadet training exercise?

A. Yes.

Q. Did the cadets follow the same procedure when they were transporting each individual woman to the day room during the cadet training exercise?

A. Yes.

Q. Did the cadets follow the same procedure when they supervised women who were sitting in the day room during the cadet training exercise?

A. Yes.

7

Q. Did any supervisors instruct the cadets to differentiate in their treatment of the prisoners that were subjected to the cadet training exercise based on their housing unit?

A. No.

Q. Did any supervisors instruct the cadets to differentiate in their treatment of the women who were subjected to the cadet training exercise based on the disciplinary status or disciplinary history of the women?

A. No.

Q. Did any supervisors instruct the cadets to differentiate in their treatment of the women who were subjected to the cadet training exercise based on the security level of the individual women?

A. No.

Q. Did any supervisors instruct the cadets to differentiate in any way during the cadet training exercise based on the individual prisoner that they were dealing with?

A. No.

Q. . . . Were the rules that the prisoners were expected to follow during the cadet training exercise the same for all prisoners during the cadet training exercise?

A. Yes.

Q. Were there any differences in the rules that the prisoners were expected to follow during the cadet training exercise in housing unit 11 as opposed to housing unit 15?

A. No.

*Id.* at 38:10-41:02.

At least 99 women submitted grievances following the training exercise. Exh. C. Rather than treating the grievances as distinct and varied, a single grievance officer responded to all of the grievances with a unitary message: that "[t]he shakedown was conducted in accordance with institutional and administrative directives" and that "Internal Affairs has investigated the allegations and determined them to be without substance." *See id.*

8

This unconstitutional strip search was unfortunately not a one-time event, but a data point in a pattern of unconstitutional strip searches.  Indeed, many of these women had already been forced to undergo a similarly traumatizing mass strip search at Lincoln Correctional Center in March 2011, over which they had already brought suit.  *See* Exh. J, Sixth Amended Complaint, *Throgmorton, et al. v. Reynolds, et al.*, No. 3:12-cv-03087-RM-TSH (C.D. Ill.); Exh. K, Declarations; Exh. L, Expert Report of Wendy Still, at 8 (summarizing expert opinions).

To hold the Defendants accountable for this coordinated violation of their constitutional rights, named Plaintiffs Sandra Brown, Latrasha Johnson, Jerri Lindsey, and Lavi Conner have filed a complaint against individual IDOC employees on behalf of themselves and Class I.  To ensure that the unconstitutional acts of degradation and humiliation of October 31, 2013 do not recur, Ms. Brown, a named Plaintiff who remains in IDOC custody, brings an additional claim for injunctive relief on behalf of herself and all other women similarly situated.

## PROPOSED CLASSES

Plaintiffs propose certification of the following class under Federal Rule of Civil Procedure 23(b)(3):

Class I ("Damages Class"):  All individuals who were subjected to the October 31, 2013 cadet training exercise at Logan Correctional Center.

The four named Plaintiffs seek to represent this class.  The members of Class I include inmates who are presently in-custody as well as former Logan Correctional Center inmates who were released at some time after October 31, 2013.  Because the claims of the in-custody class members will be analyzed through the lens of the Prison Litigation Reform Act, it is appropriate to divide Class I into two separate subclasses:

Subclass A, consisting of:  All individuals who were subjected to the October 31, 2013

9

cadet training exercise at Logan Correctional Center, and who remain in the custody of the Illinois Department of Corrections since that time.

Subclass B, consisting of:  All individuals who were subjected to the October 31, 2013 cadet training exercise at Logan Correctional Center, and who were subsequently released from the custody of the Illinois Department of Corrections.

Named Plaintiffs Brown was subjected to the October 31, 2013 strip search and remains incarcerated within the custody of the Illinois Department of Corrections; she seek to represent Subclass A.  Named Plaintiffs Lindsey, Conner, and Johnson were subjected to the October 31, 2013 strip search and are no longer in IDOC custody; they seek to represent Subclass B.

Plaintiffs also propose certification of the following class under Federal Rule of Civil Procedure 23(b)(2):

Class II ("Injunctive Relief Class"):  All women who are currently incarcerated at Logan Correctional Center, and all women who will be incarcerated at Logan Correctional Center in the future, who are at risk of being subjected to a group strip search during a cadet training exercise.

Named Plaintiff Brown seeks to represent this class.[2]  See Complaint, ¶ 61.

## DISCUSSION

Courts routinely permit challenges to prison and jail strip searches to proceed as class actions pursuant to Rule 23.  See, e.g., Throgmorton, et al. v. Reynolds, et al., Case No. 1:15-cv-01447-MMM (C.D. Ill.), Dkt. Nos. 68 & 87 (certifying damages and injunctive classes challenging unconstitutional strip searches during a 2011 cadet training exercise at Lincoln Correctional Center); Streeter v. Sheriff of Cook Cty., 256 F.R.D. 609 (N.D. Ill. 2009) (certifying class action challenging jail strip searches); Young v. County of Cook, 2007 WL 1238920 (N.D.

---

[2] Plaintiff's counsel recently learned that in late September 2016, the Illinois Department of Corrections transferred Brown from Logan Correctional Center to the only other Illinois prison housing women, Decatur Correctional Center.  Brown remains subject to transfer back to Logan at any time.

Ill. Apr. 25, 2007) (same); *Blihovde v. St. Croix Cty., Wisconsin*, 219 F.R.D. 607 (W.D. Wis.

2005) (same); *Bullock v. Sheahan*, 225 F.R.D. 227, 229 (N.D. Ill. 2004) (same); *Calvin v. Sheriff*

*of Will County*, No. 03 C 3086, 2004 WL 1125922, at *3 (N.D. Ill. May 17, 2004); *Gary v.*

*Sheahan*, 1999 WL 281347 (N.D. Ill. March 31, 1999) (declining to decertify class action

challenge jail strip search policy).

No reason exists to depart from this authority here.  Plaintiffs' proposed classes satisfy

the requirements of Rule 23(a) and (b) and should be certified.

## I.   CLASSES I AND II SATISFY RULE 23(a)'S THRESHOLD REQUIREMENTS.

### A.   Numerosity

Federal Rule of Civil Procedure 23(a)(1) requires that the class be so numerous that it

would be impracticable to join all of the members in a single action.  This is not a difficult hurdle

to meet.  Courts have generally found that forty or so members are sufficient.  *See Lucas v. GC*

*Services L.P.*, 226 F.R.D. 337, 340 (N.D. Ind. 2005) (citing *Swanson v. Am. Consumer Indus.,*

*Inc.*, 415 F.2d 1326, 1333 n.9 (7th Cir. 1969)); *Parker v. Risk Management Alternatives, Inc.*,

206 F.R.D. 211, 213 (N.D. Ill. 2002).  The exact size of the class need not be known at the

certification stage, so long as the plaintiffs put forward evidence of a numerous class. *Lucas*, 225

F.R.D. at 340 (citations omitted); *see also Marcial v. Coronet Ins. Co.*, 880 F.2d 954, 957 (7th

Cir. 1989); *Young*, 2007 WL 1238920, at *2; *Lopez v. City of Chicago*, 2002 WL 31415767, at

*4 (N.D. Ill. Oct. 25, 2002).

Class I easily satisfies the numerosity requirement. By the Illinois Department of

Corrections' own estimates, somewhere between 170 and 200 women were subjected to the

October 2013 strip search.  Exh. A at 22:04-22:13. Logan Correctional Center's own contraband

11

slip records corroborate these estimates. *See* Exh. I, Shakedown Slips (reflecting the names of approximately 200 women subjected to the strip search); *see also* Exh. A at 71:22-72:06, 73:14-73:20 (confirming on behalf of IDOC that these shakedown slips reflect the identity of women strip searched during the training exercise). Grievances from 99 women subjected to the strip search (Exh. C), deposition testimony from three class representatives (Exhs. D, E, & F), and declarations from an additional thirteen women (Exh. B), further establish numerosity.

Likewise, Class II satisfies the numerosity requirement. Logan Correctional Center holds approximately 2000 inmates, Exh. A at 15:22-15:25, and additional women housed in IDOC's Decatur Correctional Center are subject to transfer to Logan at any time. All of these women are at risk at any time of being subjected to an unconstitutional strip search during a cadet training exercise. Thus, both Class I and Class II satisfy the Rule 23(a)(1) numerosity requirement.

### B.  Commonality

Rule 23(a)'s commonality inquiry requires the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Even a single common question is sufficient. *Bell*, 800 F.3d at 374 (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)); *Adams v. R.R. Donnelley & Sons*, 2001 WL 336830, *5 (N.D. Ill. Apr. 6, 2001). The requirement is satisfied "[w]here the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 755-56 (7th Cir. 2014) (distinguishing *Wal-Mart Stores, Inc.* 564 U.S. 338, in which "the only connection among a huge number of adverse employment actions was that the same defendant allegedly discriminated against numerous people on the same basis").

Numerous courts have held that similar allegations involving strip search practices satisfy the

12

commonality requirement. In *Young v. County of Cook*, for example, the Court certified a class of male detainees alleging that they were strip searched in a degrading manner, explaining that "[c]ourts have consistently held that class actions challenging blanket strip search policies satisfy Rule 23(a)(2)'s commonality requirement." 2007 WL 1238920, at *5; *see also Bullock*, 225 F.R.D. at 229 (Plaintiff's allegations that "defendants' policy of strip searching male inmates under the stated conditions violates their Fourth and Fourteenth Amendment rights" is "central to the claims of the proposed class," satisfying the commonality requirement); *Throgmorton, et al. v. Reynolds, et al.*, Case No. 1:15-cv-01447-MMM (C.D. Ill.), Dtk. Nos. 68 & 87; *Streeter*, 256 F.R.D. 609; *Calvin*, 2004 WL 1125922, at *3; *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1267 (7th Cir. 1983). Courts have reached the same result in other class actions challenging standardized jail or prison policies. *See, e.g.*, *Parish v. Sheriff of Cook County*, 2008 WL 4812875, at *4 (N.D. Ill. Oct. 24, 2008) (challenge to jail's practice of denying certain medications to detainees); *Jackson v. Sheriff of Cook County*, 2006 WL 3718041, at *4 (N.D. Ill. Dec. 14, 2006) (challenge to unsanitary methods of testing detainees for sexually transmitted diseases); *Phipps v. Sheriff of Cook County*, 249 F.R.D. 298, 301 (N.D. Ill. 2008) (challenge to widespread violations of the Americans with Disabilities Act); *see also Dunn v. City of Chicago*, 231 F.R.D. 367, 373 (challenge to police department practice of subjecting detainees to unconstitutional conditions of confinement).

The putative class members' damages claims implicate common questions of fact: specifically, whether class members were strip searched in full view of non-participants to the search, including male and female cadets, correctional officers, and administrators, and other prisoners; whether menstruating women were forced to remove sanitary products in front of others and bleed on themselves during the searches; whether Defendants denied women bathroom access

13

for hours during the training exercise; whether Defendants subjected prisoners to lengthy, painful, and unnecessary handcuffing solely to provide a training opportunity for cadets; and whether Orange Crush tactical team members in riot gear threatened and yelled at compliant prisoners during the training exercise.  Ample evidence supports the existence of these common factual questions: for example, thirteen prisoners submitted declarations regarding the ordeal (Exh. B), and 99 submitted grievances, all raising similar contentions (Exh. C).  In recognition of the common factual issues, IDOC responded to the many grievances filed regarding the cadet training exercise by stating that a single, unitary investigation had been undertaken, and by providing the same exact written response (Exh. C). IDOC likewise admits that putative class members were strip searched as part of a unified, highly supervised cadet training exercise without significant variation. *See supra* at 6-8 (describing this proof in detail).

Common questions of law abound as well.  First, each class member will be seeking to prove that the strip search they underwent violated the Eighth Amendment, relying on common proof of the punitive characteristics of the training exercise.  Second, each class member will need to prove that the misconduct was scarried out in a widespread fashion, in the open, and that the supervisory Defendants exhibited deliberate indifference to the suffering caused by the strip searches.  This, too, is a common question, sufficient to satisfy the commonality prong.

Finally, Plaintiffs' injunctive claims likewise rely on common factual and legal contentions regarding the cadet training exercise.  To obtain injunctive relief, the putative class will rely on the same core factual allegations about the characteristics of the training exercise. This core conduct is common to both the October 31, 2013 Logan Correctional Center training exercise and an earlier March 31, 2011 cadet training exercise at Lincoln Correctional Center.

14

During the March 31, 2011 training exercise, prisoners were likewise forced to strip naked in groups, without accommodation for menstruating women, in full view of men and other non-participants to the strip searches; threatened and disparaged by Orange Crush tactical team officers in riot gear; and also handcuffed unnecessarily and painfully by cadets for long periods of time. *See* Exh. K (Declarations); Exh. L, Expert Report of Wendy Still, at 8 (summarizing expert opinions). In addition, resolution of the injunctive claim will turn on common proof of IDOC's revisions to its policies or enforcement of its stated policies.

Whether the class members proceed as a class or in individual lawsuits, each will have to prove the same facts using much of the same evidence and advance the same legal theories to establish the Defendants' liability for constitutional violations. Accordingly, commonality is established.

### C.     Typicality

Rule 23(a)(3) requires that the claims of the class representatives be typical of those of the class as a whole. A "plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992); *see also De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) (same). Some factual distinction and variance in the injuries sustained by each class member will not defeat typicality, so long as the plaintiffs' claims have the same "essential characteristics" as those of the putative class members. *Rosario*, 963 F.2d at 1018; *De La Fuente*, 713 F.2d at 232. The commonality and typicality inquiries "tend to merge," and a finding of one typically results in a finding of the other. *See Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 158, n.13 (1982).

15

Here, the putative class's constitutional rights were violated by the same common course of conduct during a cadet training exercise at which approximately 200 women endured group strip searches. The four named plaintiffs bring the same causes of action as the rest of the class members. *Compare* Exh. D, E, & F; *with* Exh. B & C. Each of the named Plaintiffs will have to challenge the same conditions during the strip searches as the absent class members they seek to represent, and all are relying on the same legal theories as to why the strip searches violated the Constitution. Nothing more is required. Plaintiffs therefore meet their burden to show typicality.

### D.      Adequacy of Representation

Pursuant to Rule 23(a)(4), the class representatives and their counsel must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This determination has two elements: "the adequacy of the named plaintiffs' counsel, and the adequacy of the representation provided in protecting the different, separate and distinct interests" of the class members." *Olson v. Brown*, 284 F.R.D. 398, 412-13 (N.D. Ind. 2012) (quoting *Retired Chi. Police Ass'n*, 7 F.3d at 598). "Absent any conflict between the interests of the representative and other class members, and absent any indication that the representative will not aggressively conduct the litigation, fair and adequate protection of the class may be assumed." *Westefer v. Snyder*, No. CIV. 00-162-GPM, 2006 WL 2639972, at *6 (S.D. Ill. Sept. 12, 2006) (quotation omitted).

The undersigned counsel have the competency and ability to litigate this case. Plaintiffs' counsel, Loevy & Loevy, has represented plaintiffs in multiple class action suits, including suits involving strip searches. *See, e.g., Throgmorton, et al. v. Reynolds, et al.*, Case No. 3:12-cv-

16

03087-RM-TSH (C.D. Ill.) (class action challenging unconstitutional strip searches during 2011 cadet training exercise at Lincoln Correctional Center); *Young v. County of Cook*, Case No. 06 C 552 (N.D. Ill.) (strip search class action representing detainees at Cook County Jail); *Brown v. City of Detroit*, No. 10 CV 12162 (E.D. Mich.) (civil rights class action involving City of Detroit's unconstitutional detention policies, including length of confinement); *Flood v. Dominguez*, Case No. 08 C 153 (N.D. Ind.) (conditions of confinement class action representing detainees at Lake County Jail); *Dunn v. City of Chicago*, Case No. 04 C 6804 (N.D. Ill.) (civil rights class action involving the Chicago Police Department's unconstitutional detention policies).

Regarding the second part of the Rule 23(a)(4) requirements, there is absolutely no evidence to suggest that any of the class representatives are antagonistic to any absent class member or that they do not have a sufficient interest to vigorously pursue the claims. They are committed to prosecution of the action, and therefore satisfy the requirements of Rule 23(a)(4).

## II.    CLASS I SATISFIES THE REQUIREMENTS OF RULE 23(b)(3).

A (b)(3) class is properly certified so long as "questions of law or fact common to class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### A.    Predominance

The "predominance" prong of this test is satisfied "when "common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication." *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1059 (7th Cir. 2016) (citation and

internal punctuation marks omitted); *see also Young*, 2007 WL 1238920, at *7 ("When a class challenges a uniform policy or practice, the validity of that policy or practice tends to be the predominant issue in the ensuing litigation"); *Rahim v. Sheahan*, 2001 WL 1263493, at *14 (N.D. Ill. 2001) ("the predominance requirement of Rule 23(b)(3) [is] satisfied by the allegations of standardized conduct . . ."). "Rule 23 does not demand that every issue be common; classes are routinely certified under Rule 23(b)(3) where common questions exist and predominate, even though other individual issues will remain after the class phase." *Kleen Prod. LLC v. Int'l Paper Co.*, No. 15-2385, 2016 WL 4137371, at *2 (7th Cir. Aug. 4, 2016) (citing *McMahon v. LVNV Funding*, 807 F.3d 872, 875-76 (7th Cir. 2015); *see also Pella Corp. v. Saltzman*, 606 F.3d 391, 393 (7th Cir. 2010).

Here, the putative class bases its claims on a common, unconstitutional course of conduct by the Defendants that subjected approximately two hundred prisoners to Eighth Amendment violations during a single incident. The class members all rely on the same legal theories and facts to prove their case, and even the Illinois Department of Corrections admits that the incident at issue was uniformly implemented; supervised throughout by Acting Warden Angela Locke; and investigated in a single, unitary investigation. *See supra* at 6-8. Courts have held the predominance standard satisfied in analogous cases. *See, e.g.*, *Throgmorton, et al. v. Reynolds, et al.*, No. 3:12-cv-03087-RM-TSH (C.D. Ill.), Dtk. Nos. Dkt. Nos. 68 & 87; *Dunn*, 231 F.R.D. at 377 (collecting cases); *see also Young v. County of Cook*, 2007 WL 1238920; *Rahim*, 2001 WL 1263493. No reason exists to depart from this authority here.

### B.     Superiority of Class Litigation

"Rule 23(b)(3) class actions are designed to 'cover cases in which a class action would

achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Suchanek*, 764 F.3d at 759 (quoting *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 615 (1997)). A Rule (b)(3) class, with its opt-out provisions for any class members who wish instead to pursue individual claims, "facilitates the 'vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.'" *Id.* at 759 (quoting *Amchem Prods., Inc.*, 521 U.S. at 617).

Here, a class action presents the superior method for adjudicating claims arising from the cadet training exercise. From the standpoint of judicial economy, a class action would obviate the need for a multitude of federal civil rights lawsuits all addressing essentially the same claims and questions of fact. *See Savanna Group, Inc. v. Trynex, Inc.*, 2013 WL 66181, at *16 (N.D. Ill. Jan. 4, 2013) ("Given the large number of plaintiffs in this suit and the similarity of their claims, disposition by class action is an efficient use of judicial resources.") (citing cases); *Bonner*, 2006 WL 3392942, at *5 (where a "dispute contains a set of legal and factual issues that are shared by the members of the class … class certification is more efficient than multiple individual suits at dealing with these common questions"); *Cancel v. City of Chicago*, 254 F.R.D. 501, 512 (N.D. Ill. 2008) (individual lawsuits challenging the same municipal policies "would require multiple courts to evaluate the same evidence and analyze the same policies and practices in what would amount to a wastefully inefficient enterprise").

Second, if the class members cannot join together, some will have to forfeit their claims due to the expense of litigation, the difficulty to securing counsel, and the difficulty of prevailing in constitutional violation cases. The absent class members do not have an interest in bringing

19

individual cases but, rather, need the efficiencies of the class action mechanism to pursue their

claims at all. Finally, from the standpoint of reform, a class action provides the best chance of

bringing meaningful change to change the practices of IDOC administrators.

Finally, a class action is a perfectly manageable way of trying the constitutional claims at

issue in this case. In fact, there is little difference between the proof necessary at an individual trial

to prove the Defendants' liability for the public group strip search and the proof at a class-wide trial.

Neither the Court nor Defendants have raised any issues regarding the manageability of the class

action in the parallel *Throgmorton* litigation, which will proceed to trial in just three weeks. The

proof is essentially the same, as both an individual plaintiff and the putative class seek to hold the

individual Defendants liable for the same unconstitutional public group strip searches. Thus, Rule

23(b)(3) is the appropriate mechanism to address the damages issues raised by Class I in this case.

## III. CLASS II SATISFIES THE REQUIREMENTS OF RULE 23(b)(2).

Certification of a class under Rule 23(b)(2) requires that "the party opposing the class has

acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or

corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P.

23(b)(2). Cases seeking injunctions against class-based violations of civil rights "are prime

examples" of Rule 23(b)(2) classes. *Amchem Prods.*, 521 U.S. at 614. Indeed, "[p]roviding a

vehicle for redressing civil rights violations on a classwide basis through injunctive or declaratory

relief is the fundamental purpose of Rule 23(b)(2)." *Westefer v. Snyder*, 2006 WL 2639972, at *9

(collecting cases); *see also Meisberger v. Donahue*, 245 F.R.D. 627, 631 (S.D. Ind. 2007) (action by

prisoners to enjoin certain policies of the Indiana Department of Corrections "fits the mold for which

Rule 23(b)(2) was drafted"); *Hargett v. Baker*, 2002 WL 1433729, at *4 (N.D. Ill. July 1, 2002)

("[A]n inmate civil rights action challenging the constitutionality of their treatment is a 'prototypical candidate' for class certification under Rule 23(b)(2).").

The Seventh Circuit has interpreted Rule 23(b)(2) as requiring class members' claims to be "cohesive and homogeneous such that the case will not depend on adjudication of facts particular to any subset of the class nor require a remedy that differentiates materially among class members." *Lemon v. Int'l Union of Operating Eng'rs*, 216 F.3d 577, 580 (7th Cir. 2000). *Cf. Wal-Mart Stores, Inc.*, 564 U.S. at 360-61 (holding the rule inapplicable if "each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant").

Class II, comprised of all women incarcerated at Logan Correctional Center, seeks certification under Rule 23(b)(2) to ensure that Defendants are prevented from organizing any public group strip searches in the future, whether as part of IDOC "training exercises" or in the facility at large. Plaintiffs seek a single injunction that, for example, enjoins Defendants from strip-searching prisoners in groups, in the presence of non-participants to the search, absent an emergency or exigent circumstance. Such an injunction would apply equally to all class members and hinges on standardized conduct by Defendants. Thus, a single injunction judgment would provide relief to each member of the class, rendering class certification appropriate under Rule 23(b)(2).

## **CONCLUSION**

For the reasons set forth above, Plaintiffs respectfully request that the Court:

1.  Certify Class I under Rule 23(b)(3), with corresponding Subclasses A & B;
2.  Certify Class II under Rule 23(b)(2);
3.  Appoint Named Plaintiffs to be the representatives of Class I;
4.  Appointed Named Plaintiff Brown to be the representative of Class II; and,
5.  Appoint Plaintiffs' counsel, Loevy & Loevy, as counsel for Classes I and II.

RESPECTFULLY SUBMITTED,

/s/ Ruth Brown

Arthur Loevy
Michael Kanovitz
Jon Loevy
Tara Thompson
Ruth Brown
LOEVY & LOEVY
312 N. May St., Ste. 100
Chicago, IL 60607
(312) 243-5900

## CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 7.1(B)(4)

I, Ruth Brown, an attorney and counsel for Plaintiffs in the present case, hereby certify that he foregoing Memorandum of Law complies with this Court's Local Rule 7.1(B)(4) in that the word processing program I used to prepare the Memorandum, Microsoft Word, measures the Word Count of the Argument Section of this Brief at 6464 words and 40,823 characters (including spaces), including headings, footnotes, and quotations.

/s/ Ruth Brown

## CERTIFICATE OF SERVICE

I, Ruth Brown, an attorney, certify that on October 18, 2016, I caused the foregoing to be served on all counsel of record via CM/ECF electronic filing.

/s/ Ruth Brown